**Milton COTTO, Petitioner,**

v.

**Louis MANN, Superintendent of Shawangunk Correctional Facility, Respondent.**

**No. 95–CV–2215 (ARR).**

United States District Court, E.D. New York.

Jan. 16, 1998.

Lawrence Gerzog, Christopher H. Martin, New York City, for Petitioner.

Andrew Leff, Assistant District Attorney, Kings County District Attorney, Brooklyn, NY, for Respondent.

### OPINION AND ORDER

ROSS, District Judge.

In this case, the court is called upon to determine whether the unconstitutional admission of statements at trial made by the petitioner's non-testifying co-defendant was merely harmless error or was sufficiently prejudicial to necessitate the grant of a writ of habeas corpus. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In making this determination, the court applies the standard of review set out in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), and thereunder reviews petitioner's conviction to determine whether the *Bruton* error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638.

### BACKGROUND

On October 12, 1982, Milton Scher and Rose DeGennaro were shot and killed in a Brooklyn pharmacy. Scher, who was 73 years old, was the store's pharmacist; De-Gennaro, who was 34 years old, was a customer. Three individuals were charged with

and convicted of the killings: Kareem Abdul Latif (a/k/a George Suarez), Robert Rodriguez, and the petitioner, Milton Cotto. A fourth person, Michael Donnes, was also alleged to have participated in the crimes, but was never apprehended. At the time of the incident, Latif was 29 years old, Rodriguez was 19 years old, and petitioner was 17 years old.

The investigation that culminated in the arrest of these individuals was led by Detective Louis Scarcella and Investigator William Shields, who were assigned to the case on the day of the shootings. A few weeks later, Detective Scarcella learned the whereabouts of two allegedly missing persons, Sandra Nieves and Nancy Santiago, and brought them to the police station. There, Nieves and Rodriguez made statements implicating Latif, Rodriguez, Donnes, and petitioner in the pharmacy murders. The following day, Milton Cotto, accompanied by his mother, voluntarily came to the station and made a statement to Detective Scarcella. *See* Pretrial Hearing Trans. (Scarcella: 30–32). Rodriguez also made a statement to Scarcella that day. Both Cotto and Rodriguez made subsequent statements to polygraph examiner Joseph Ponzi, and audiotaped statements to Assistant District Attorney Philip Guzman. Latif, meanwhile, was located by Investigator Shields at Kingsborough Psychiatric Center, and chose not to give a statement to law enforcement officials.

On November 1, 1983, Justice Edward K. Pincus of the New York State Supreme Court, Kings County, conducted a pre-trial hearing to determine, *inter alia*, whether the defendants should be tried together in a single proceeding. Despite the fact that the state's case relied heavily on the statements of Cotto and Rodriguez, and the fact that the defendants' defenses were mutually antagonistic,[1] Justice Pincus ruled that a joint trial would not prejudice any of the defendants. According to Justice Pincus, there was "no question that the two defendants [Cotto and Rodriguez] could be tried together" since their "statements are virtually identical." *See* Pre-trial Hearing Trans., at 538. Justice Pincus also found no *Bruton* issue requiring severance for Latif. Co-defendant Latif's conviction was subsequently overturned by the Appellate Division[2] for a violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *See People v. Latif*, 135 A.D.2d 736, 522 N.Y.S.2d 638 (2d Dept.1987).

At trial, the evidence established that the following events transpired on October 12, 1982. Petitioner, Donnes and Rodriguez were together with Latif in Latif's apartment early that afternoon, having stayed there the previous night. A conversation took place in which Latif commented that he wanted to "break Doc's neck," referring to Scher, the pharmacist. The defendants then traveled together to the pharmacy, where Latif spoke to Scher, while Rodriguez, Donnes, and Cotto waited nearby. After approximately one half hour, Ms. DeGennaro entered the pharmacy, and Latif suggested, most likely in jest, that the woman was having an affair with "Doc." The pharmacist, Scher, asked Latif if he was "ready to pay." At this point, petitioner left the pharmacy to urinate, and then returned to the store. A little while later, Latif forced Scher, and then DeGennaro, who was still in the store, into the back area and shot them. The evidence at trial indicated that Rodriguez assisted Latif by grabbing DeGennaro and dragging her into the back of the store. Upon hearing the shots, petitioner left the store and ran home. The other defendants followed.

In addition to the statements taken from petitioner and Rodriguez, some of which were audiotaped and played for the jury in full, substantial corroborating evidence was adduced at trial implicating petitioner's co-defendants, Latif, Rodriguez, and Donnes, in the planning and execution of the crime. Sandra Nieves, a former girlfriend of Latif and Donnes's third cousin, testified that Latif

---

1. While Cotto and Rodriguez both stated that Latif had committed the murders, Latif claimed that he had not been present at the crime scene at all, but had met up with the distraught perpetrators afterwards. *See* Trans. (Latif: 920–21).

2. At Latif's retrial, petitioner testified against Latif, and Latif was convicted. *See People v. Latif*, 212 A.D.2d 548, 622 N.Y.S.2d 326 (2d Dept. 1995), *lv. denied*, 85 N.Y.2d 975, 629 N.Y.S.2d 735, 653 N.E.2d 631 (1995).

had confessed to her that he had killed Scher and DeGennaro, and that Rodriguez had also admitted to her his role in Ms. DeGennaro's murder. Nieves also testified that on or about October 19, 1982, she had seen Latif carrying a .357 Magnum, and that he had told her that he had used .38 caliber bullets in the gun and asked her to throw the spent shells in the sewer. *See* Trans. (Nieves: 370–72). Police investigators executing a search warrant recovered one .357 shell, two .38 caliber cartridges, one .357 cartridge, and one .38 caliber shell from Latif's mother's home. Forensic experts confirmed that the victims had been shot with .38 caliber bullets, *See* Trans. (Tota: 484–87), and that the bullets were fired from a .357 Magnum like one sold to Latif in 1979. Latif's fingerprints were also found at the crime scene. *See* Trans. (Stevens: 898–900). This evidence was introduced as further proof of Latif's role in the crime. *See* Trans. (Scarcella: 216–23).

On December 2, 1983, petitioner was convicted of two counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[3]) and one count of Attempted Robbery in the First Degree (N.Y. Penal Law §§ 110/125.20[2]). Co-defendants Rodriguez and Latif were convicted of four counts of Murder in the Second Degree and one count of Attempted Robbery in the First Degree, and Latif was additionally convicted of one count of Criminal Possession of a Weapon in the Second Degree. Rodriguez and Latif were sentenced to two consecutive terms of 25 years to life. Petitioner is currently serving two terms of seventeen years to life for the murder counts, and one additional term of five to fifteen years on the attempted robbery count. All three of petitioner's terms were set to run concurrently.

In 1987, the Supreme Court decided *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), which strengthened *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), by abolishing the "interlocking confessions" exception to the ban on the receipt of a non-testifying co-defendant's confession. The Second Circuit has held that the holding of *Cruz* applies retroactively. *See Samuels v. Mann*, 13 F.3d 522, 526 (2d Cir.1993); *Graham v. Hoke*, 946 F.2d 982, 994 (2d Cir.1991).

In petitioner's appeal to the Appellate Division, he raised the *Cruz* issue, arguing that he was deprived of his rights to confrontation and due process by the admission of the interlocking statement of a non-testifying co-defendant which implicated him more deeply than did his own statement. Petitioner also raised three other claims: 1) that the evidence was insufficient to prove that he acted in concert with Latif and Rodriguez, 2) that he received ineffective assistance of counsel, and 3) that petitioner's sentence was excessive, given his age, learning disabilities, strong family ties, and lack of a criminal record. Petitioner's conviction and sentence were affirmed by the New York State Supreme Court, Appellate Division, Second Department, in a decision dated September 23, 1991. *See People v. Cotto*, 176 A.D.2d 291, 574 N.Y.S.2d 225 (2d Dept. 1991). The Appellate Division found that "[t]he record established that before the robbery, the defendant was aware that a robbery of the drugstore was intended and had agreed to act as a lookout during its commission." *People v. Cotto*, 176 A.D.2d at 292, 574 N.Y.S.2d 225. On December 12, 1991, petitioner was denied leave to appeal to the New York State Court of Appeals. *See People v. Cotto*, 79 N.Y.2d 826, 580 N.Y.S.2d 206, 588 N.E.2d 104 (1991).

Having exhausted his state remedies, petitioner *pro se* filed this application for a writ of habeas corpus on June 2, 1995, pursuant to 28 U.S.C. § 2254 et seq. (1996). The court appointed counsel to assist petitioner in his habeas petition, and with the assistance of counsel the petitioner filed a reply brief addressing the *Bruton/Cruz* issue.

**A. The Evidence Against Petitioner**

Petitioner does not dispute the above described account of the facts, and concedes that he was present at the pharmacy when the shootings occurred. The issue facing the jury with regard to petitioner Cotto was not whether he was present at the crime scene, but whether he possessed the necessary *mens rea* to support a conviction for attempted robbery, which also served as the base

offense underlying his conviction for felony murder. The sole evidence presented to the jury regarding petitioner's participation in the crime were statements made by co-defendant Rodriguez and by Cotto himself. The court thus turns to an examination of these statements.

### 1. Cotto's statements

Petitioner gave a series of five statements to investigators, the first of which was made to Detective Scarcella. At trial, Scarcella recounted the substance of this statement as follows:

> "On October 12th, 1982, between three and four o'clock, we went into the drugstore, me Ash"—meaning Rodriguez—"Michael and Kareem. Kareem was talking to Doc," meaning Mr. Scher. "A few minutes went by. People came in and out. Kareem had a list of stuff he wanted to buy. About a half hour went by. A lady came in. She was the Doc's playmate" meaning DeGennaro. "Kareem said the girl was having an affair with Doc. Doc asked Kareem, "are you ready to Pay?" I walked out of the store to take a piss on 52nd Street. I came back and said, "Why so many cops?" I saw the police cars. Now I was standing near the door of the drugstore. I was just about to leave. I heard the shots, three. I got scared and started walking across the street. A girl saw me, she knows me. I got to 51st Street and started running down to Old New Utrecht Road. I thought, "Who did this?" Then I heard them yell at me, "Run, run." I looked back and saw Michael and Ash, meaning Rodriguez. I didn't see Kareem. Me, Michael and Ash went to my house. As we came to 43rd Street, we met Kareem coming from 44th Street on Dahill Road. Then we all went to my hallway and we started talking... I wanted to go to the police. I didn't think Michael and Ash, meaning Rodriguez, were involved. I was raised with them, Michael and Rodriguez. I was scared. I know one of them did it. It was Kareem."

Trans. (Scarcella: 202–03).

Later on the day that he gave his first statement, petitioner was asked to give a statement to Detective Joseph Ponzi, a polygraph examiner. As Ponzi's testimony indicates, that statement was substantially identical to the statement petitioner had given to Scarcella. Ponzi then told petitioner that he planned to administer a polygraph examination in which he would ask petitioner four questions: if he had planned the robbery with co-defendant Latif, if he had seen Latif shoot Scher and DeGennaro, if he had seen Latif take out a gun in the drugstore, and if he was holding back information regarding the shooting. Petitioner indicated that he would be uncomfortable answering no to these questions, and then proceeded to give a second statement to Ponzi which added further details about the events preceding the crime. Assistant District Attorney Guzman then took two audiotaped statements from petitioner, the second and more detailed of which was recorded at 1:00 p.m. on October 28th. A.D.A. Guzman began his interrogation of petitioner by focusing on the events preceding the robbery. As petitioner recounted, he, Rodriguez and Donnes were at the apartment of Latif, and Rodriguez, Donnes and Latif were having a conversation in the middle of which petitioner entered:

> I was taking a shower, first, I just came out of the showers and Kareem had asked Michael is he ready and Michael gave him a funny face and ... I'm curious ... I'm curious what, you know, they were talking about.... I heard, he had, he had asked Michael if I was ready.... And I was curious and he gave him a funny face. Michael gave them a funny face. I don't know and I'm curious, you know, when to find out what they're talking about.

Petitioner interjected: "yeah. Man, I'd do anything you wanted to do, you know." Respondent's Exh. G (Trans. of Audiotaped Interview, Tape A1974) ("A1974"), at 6–7. Petitioner stated that at this point he had no idea what Latif meant in asking if petitioner "was ready." *Id.* Then, according to petitioner, "Kareem said I'm gonna go, go to the drugstore, us four and he got a list of things what he wants. Then after that, after he gets all the stuff, he gonna crack Doc's neck." *Id.* Petitioner stated that the three others took Kareem's statement "like a joke." *Id.*

"I said, no, I thought inside, you know, this guy, you know, he's playing around, you know. I didn't expect him to, to say anything like that." Latif then told petitioner to get dressed and ready to go, but petitioner still "thought he was joking around," and therefore did "[n]othing. We just took it like a joke." *Id.* Reiterating that he thought Latif was merely joking, petitioner then described getting dressed and taking a bus to the pharmacy. He denied that anyone said "anything like yeah, we're ready or we're not ready." *Id.* at 12.

During the interrogation, petitioner stated that, because Latif "carries it every day," he assumed Latif had a gun on this occasion. But petitioner did not actually see Latif with a gun on the afternoon prior to the shootings, and his statement gave no indication that he was specifically aware prior to entering the pharmacy that Latif was armed, or that he understood that Latif planned to use a weapon at the pharmacy. According to petitioner, nothing more was said about the purpose of the trip. "We were just talking religious words. . . . you know, joking around, us three. It was me and Michael cause we just joke around like that." *Id.* at 11.

Once at the pharmacy, petitioner began to get nervous, "cause I knew that this guy's really serious. I wasn't really nervous but I was, you know, this guys gonna really do that, you know, putting it in my mind." *Id.* at 13. Petitioner explained that he got up to look outside, not to act as a lookout, but "to see [if] my girlfriend was passing by." *Id.* Petitioner reasoned that if he spotted his girlfriend, or another friend outside, he would have a good excuse to leave the pharmacy. Petitioner then stated that Latif "told me stay in the door, don't let nobody in." *Id.* at 14.

At this point in the interview, A.D.A. Guzman asked petitioner a series of questions apparently hoping to establish that petitioner consciously acted during the crime as a "lookout."

Q. Is, is that what you were doing? Were you standing by the door?

A. Yeah.

Q. Okay. So what happened then?

A. I, I wanted to get out of the store.

Q. Yeah, how long, for how long were you standing up like, acting like a lookout?

A. No, it's not long like fifteen minutes.

Q. You were standing there for fifteen minutes?

A. Yeah. (inaudible).

Q. Being the lookout?

A. Right.

Q. Okay. So what happened then?

A. I wanted to, I wanted to run out of the store. I didn't wanted to get involved. And, and the way they looked, you know, Michael's and Robert's face, they didn't want to get involved either.

*Id.*

A.D.A. Guzman later returned to the issue of Cotto's role as a "lookout" during the pharmacy murders. Asked why petitioner did not immediately report what he knew about the incident to the police, he explained that:

I wanted to make sure that they don't accuse me thinking I did it. I wanted to make sure what would have happen if these guys were really involved with.

Q. Were you afraid because you were the lookout?

A. I just noticed that. I ain't, I wasn't afraid for that. I was afraid cause he gots friends."

Q. And what about his friends?

A. His friends are very dangerous I heard.

Q. But you didn't consider the fact that you may be involved because you were a lookout?

A. I didn't even call that a lookout. I was really forced, I wasn't really forced, they just got me in that corner, that I had to do it.

A1974, at 34–35.

Petitioner explained that he was now intensely looking for a reason to get out of the store. According to petitioner's statement, he started to walk outside but Latif stopped him and "says where you going." *Id.* at 16. Petitioner replied that "I'm gonna use the bathroom," in response to which, he stated,

Latif "looked at me like this guy's gonna run on me." *Id.*

According to petitioner's statement, despite what he viewed as Latif's implicit threat he left the scene in order to urinate on a building behind the store, and while there, attempted to think of a way to prevent anything from happening. Petitioner stated that he observed some police cars in the distance, and decided that he could use this to dissuade Latif from continuing with his criminal plans.

> I ran back and, and I said how I'm gonna, how I'm gonna do this. I'm already involved. So I went into the store and I, and, when I was walking through the store, a lot of cops were making u-turns going towards 52nd and going straight up.... So I wanted to make up an excuse for him not to do it, you know, his harm.... I told, I had told, you know, Michael and them, I said there's a lot of cop cars around here. Well, I don't know why there's so many cop cars. So I wanted to make the excuse for him not to do the job, you know, just, just forget about it. Let's leave.

*Id.* at 18.

Petitioner's audiotaped statements were broadcast in full to the jury.

2. Rodriguez's statements

The jury also heard the full audiotaped statements of co-defendant Rodriguez, which were similar to Cotto's in laying out the general nature of events that transpired that day.[3] It is beyond dispute, however, that Rodriguez's statements were more inculpatory of Cotto than petitioner's on all relevant points. The court identifies the most significant of these here.

First, unlike Cotto's statement, Rodriguez's statement clearly indicated that a robbery was planned at the pharmacy: "Latif was talking about Doc and he was talking about going to Doc's and robbing him and taking all the stuff ... like all the medication and all that." Trans. of Audiotaped Inter-

view, Tape A2067 ("A2067") at 5. Rodriguez's statement evidenced an agreement by both Rodriguez and petitioner to participate in the crime:

A. Oh, he [Latif] was saying just about going there and just robbing the place.

Q. And who was he talking to?

A. He was talking to Milton and Michael.

Q. And were you in the room when he was talking about these things?

A. Yeah, that's when I was waking up and I heard him talking.

Q. Alright. So, so what did Milton and Michael say when he started saying these—

A. Well, he asked, he asked them if they were down and they, they said yeah. And he asked me and I said yeah.

A2067, at 5. Detective Ponzi also testified that Rodriguez admitted knowing that Latif planned to rob the store: "He told me that Kareem was going there for the purposes of robbing the Doc...." Trans. (Ponzi: 528).

Trial testimony indicated that Rodriguez had seen Latif with a gun immediately prior to the crime. Detective Ponzi testified at trial that Rodriguez "stated to me that he saw Kareem holster his .357 Magnum before they left the apartment that day." Trans. (Ponzi: 568). Following an objection from counsel, the court asked the witness to "note any other additions, changes, differences" between Rodriguez's first and second statements to him. In response, Ponzi reiterated "[t]hat he [Rodriguez] saw Kareem holster his .357 Magnum prior to exiting the apartment." Trans. (Ponzi: 569).

Similarly, Rodriguez's statements regarding petitioner's role during the incident at the pharmacy cast petitioner's actions in an unambiguous fashion:

A. When we got into Doc's, I sat down and Michael sat down and Milton was standing by the door.

Q. Milton was the lookout.

A. Yeah.

---

3. Despite repeated inquiries from the court, neither party was able to produce a transcript of Rodriguez's audiotaped statements. Thus, the court has reconstructed Rodriguez's statements

from the trial transcript and has relied upon counsel's briefs for the accuracy of the quotations. The parties do not dispute the substance of these quotations.

Q. Okay. All of you knew what was going to be happening then, right?

A. Yeah.

A2067, at 8.

According to Rodriguez's account, the actions that petitioner characterized as an unsuccessful attempt to dissuade Latif and the others from "doing their harm," Rodriguez characterized simply as part and parcel of petitioner's duties as lookout:

A. [A]nd then Kareem was talking and then Milton looked outside. He went outside.

Q. Did Kareem say anything to Milton when he went outside?

A. No. And then Milton came back in and he said there were DTs around the corner, something like that in a beige car.

Q. What's that mean?

A. Detectives.

Q. Uh, huh.

A. So he told Kareem. So Kareem went out to check.

*   *   *

Q. Kareem came back from checking outside?

A. He came back in and he said we had to do it just quicker, waste no time.

Q. Who did he say that to?

A. To us. He came like in a huddle. He said. He came like in a huddle. He said he had to do it quicker.

A2067, at 10, 12.

Thus, here too Rodriguez's statements cast petitioner's actions in a substantially more culpable light than petitioner's own statements. In contrast to petitioner's claim that he was a passive witness to the unfolding events seeking an excuse to leave the scene of the crime, Rodriguez's statement depicted petitioner as a vigilant lookout, whose report actually encouraged Latif to "do it quicker" before police arrived.

### 3. The Prosecutor's Summation

A review of the State's summation reveals that the prosecutor mentioned the petition-er's name sixteen times, and of those, Rodriguez's name was mentioned in the same sentence or immediately thereafter fourteen times. *See, e.g.,* Trans. (People's Summ.: 1179) ("You listened to the case of Rodriguez and Cotto."); *id.* ("You have heard all this cross-examination. No prints of Cotto, no prints of Rodriguez"); *id.* at 1180 ("The line of defense that these defendants, Cotto and Rodriguez, was somehow under the thrall of their hero, the Joe DiMaggio of the .357"); *id.* at 1181 ("the only reason he is bringing that up is the same reason that Cotto and Rodriguez's attorneys advanced these other arguments"); *id.* at 1183 ("the fact that she was Rodriguez's and Cotto's friend as well"); *id.* at 1184 ("You know, you listen to the tapes of these two co-defendants, Cotto and Rodriguez, and one thing comes clear . . . The reason they were brought back is for the simple reason that when you listen to those first stories, they are incredible. The only question that the District Attorney and the Police Department had with regard to Cotto and Rodriguez's first stories is what are they holding back as to their own involvement."); *id.* at 1185 ("As a reasonable person, what goes through your mind when you hear statements such as Cotto and Rodriguez gave at the precinct?"); *id.* at 1193 ("I submit, not only to try the person who pulled the trigger . . . we are here to try the people who helped him out, these co-defendants, his own henchmen. You heard them, their own words. 'We were planning,' Rodriguez. 'I wasn't scared, he is my friend.' You heard Cotto. 'I wasn't forced, I was just sort of in a corner.' ").

Indeed, in the most extreme conflation of the statements given by these co-defendants, the prosecutor in effect attributed Rodriguez's words to Cotto: "In the case of Rodriguez and Cotto, the clients admit they were there. They admit they knew of the robbery, they admit that they knew of the robbery, they admit that they agreed with it." Trans. (People's Summ.: 1179–80). In point of fact, only Rodriguez admitted that he knew of the robbery, and only Rodriguez admitted that the defendants had agreed

with it.[4] Later in the summation, the prosecutor repeated the mischaracterization in an even more prejudicial fashion. After denigrating counsel's argument that Cotto's statement could be understood to exculpate the petitioner, he commented:

> How do you react when you hear a story like that? Do you pat them on the back and give them the medal in the parade, as [petitioner's lawyer] suggests his client should be given? Sounds good. But you think to yourself, wait a minute. These guys are holding something back as to what they did in the drug store. What they did. And sure enough, what happens? Cotto and Rodriguez are brought back to the District Attorney's office, Detective–Investigator Ponzi asked them if they are holding anything back in their involvement, and what do you hear? "Yeah, we did know. We were at Kareem's house, and yes, we knew there was going to be a robbery, and yes, we know that Latif carries a gun, and yes, we agreed to the robbery and to cracking Doc's neck. Yes, we were there, we were down, we agreed, we went there, but it was only a joke. All this is a joke."

Trans. (People's Summ.: 1185–86).

## II. DISCUSSION

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court established that the Confrontation Clause of the Sixth Amendment bars the admission of a nontestifying co-defendant's confession when the defendant has not himself confessed. *Id.* at 135–37. In *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Supreme Court determined that this bar extends even to cases where the defendant has also confessed and the confession "interlocks" with that of his co-defendant. *Id.* at 193. There is no dispute, therefore, that admission of co-defendant Rodriguez's confession against petitioner was constitutional error. The State argues, however, that the "error that occurred as a result of the admission of co-defendant Rodriguez's 'interlocking confession' at petitioner's trial was harmless beyond a reasonable doubt." Respondent's Mem. of Law, at 6.

The court notes that review of trial error is governed by a stricter standard when the subject matter is presented in a petition for a writ of habeas corpus than when it is presented on direct appeal. The Supreme Court ruled in *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), that the test in reviewing error in a habeas petition is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.*

While a number of factors are relevant in determining whether a particular error is harmless, *see Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993), the Second Circuit has indicated that certain factors are particularly important. Most significant of these is "the weight of the prosecution's case against the defendant." *Id.* In analyzing this factor, the court must consider the weight of the evidence "stripped of the *Cruz* error." *Id.* at 527. In addition, a court "must also consider the nature and content of the defendant's own statement, in particular, 'whether it satisfactorily explains his or her part in the crime without reference to the co-defendant's statement.'" *Id.* (quoting *People v. Hamlin,* 71 N.Y.2d 750, 530 N.Y.S.2d 74, 77, 525 N.E.2d 719 (1988)). Another factor to consider is "the extent to which the defendant's statement is corroborated or contradicted by other objective evidence." *Id.* (quoting *Hamlin,* 530 N.Y.S.2d at 77, 525 N.E.2d 719).

---

**4.** Rodriguez's lawyer also attempted to suggest that statements made by his client should be attributed instead to petitioner. *See, e.g.,* Trans. (Ponzi: 496) ("Are you sure, from your recollection, that you received that information from my client as opposed to from Mr. Cotto's statement ... ?").

In assessing whether the admission of co-defendant Rodriguez's statements was sufficiently injurious to require issuance of a writ of habeas corpus under the test set out in *Brecht*, this court must review the evidence that was adduced against the petitioner. In order to convict Cotto of felony murder, the State was required to prove that petitioner had the requisite *mens rea* to commit the underlying felony. The underlying felony that was the basis of petitioner's conviction for felony murder was attempted robbery. Accordingly, the jury was instructed that, in order to convict petitioner, it had to find that petitioner, acting in concert, committed the crime of attempted robbery. As part of that finding, the jury had to conclude that petitioner possessed the intent to commit robbery. *See, e.g., People v. Thorpe*, 221 A.D.2d 490, 633 N.Y.S.2d 583, 584 (2d Dept.1995); *People v. Gladman*, 41 N.Y.2d 123, 125, 390 N.Y.S.2d 912, 359 N.E.2d 420 (1976).

### A. Agreement to Rob the Pharmacy

In upholding petitioner's conviction, the New York State Appellate Division concluded that "[t]he record established that before the robbery, the defendant was aware that a robbery of the drugstore was intended and had agreed to act as a lookout during its commission." *People v. Cotto*, 176 A.D.2d at 292, 574 N.Y.S.2d 225. A review of the statements made by Cotto, however, does not bear out this conclusion. In no instance did Cotto acknowledge awareness that a robbery

was either planned or proceeding. His statement was that "Kareem said I'm gonna go to the drugstore ... and he got a list of things that he wants." A1974 at 7. Petitioner did not state that he saw Latif with a gun, but rather said that he assumed, after the fact and in the course of explaining to investigators why he suspected Latif of the shootings, that Latif must have had a gun because he always carried one. As for Latif's threat that "after he gets all the stuff, he gonna crack Doc's neck," *id.*, petitioner stated that he was certain that Latif was joking. In short, these statements do not provide evidence that petitioner was aware of a planned robbery, much less that he agreed with Latif or others to participate in or to facilitate any such robbery.

In contrast, whereas petitioner's statement indicated that he was unaware of the substance of the conversation that (according to Rodriguez's statement) had taken place in Latif's living room, Rodriguez's account placed petitioner at the center of the criminal planning. Rodriguez's admission that "they were down" with Latif's plan provided the sole proof at trial of petitioner's agreement to commit the robbery.[5]

Further, Rodriguez's statement that he saw Latif place a gun under his shirt prior to the shootings at the pharmacy makes his statement significantly more suggestive of the defendants' *mens rea* on that afternoon

---

5. Respondent asserts that petitioner had also stated that he was " 'down' with the plan, meaning that he was going to 'go along with it.' " Respondent's Mem. of Law, at 15. That is not correct. At page 458a of the trial transcript, which Respondent cites in its corrected version of its brief in support of this assertion, Detective Ponzi states that Cotto:

...told me that on the morning of October 12th, he had a discussion with Latif in his apartment, Latif's apartment whereby Latif told him he was taking a list to the drugstore, and after receiving the contents of the list, he was going to break Doc's neck.

The only testimony in which Detective Ponzi attributed an agreement to participate in the robbery to petitioner was during the pre-trial hearing held by Justice Pincus to rule on the *Bruton* issue. Not only was that testimony not before the jury, but a reading of the trial transcript makes clear that at the pre-trial hearing Ponzi had mistakenly attributed the phrase that

petitioner was "down" with the plan to the wrong defendant. The misattribution was not repeated at trial. In fact, when counsel for Rodriguez attempted to elicit from Detective Ponzi the statement that he made during the pre-trial hearing by presenting him with a transcript from that proceeding, Detective Ponzi denied that petitioner had ever made this admission to him, saying that "I believe Mr. Mort [Rodriguez's counsel] is mistaken." Other law enforcement personnel also displayed confusion at times over which defendant made particular statements. *See, e.g.,* Trans. (Guzman: 566) (A.D.A. Guzman unsure as to the order in which statements had been taken from Cotto and Rodriguez).

While they fail to support the State's erroneous factual assertions, Ponzi's and Guzman's occasional slips emphasize the ease with which even law enforcement personnel closely related to the investigation could confuse and conflate the statements made by Cotto and Rodriguez.

than petitioner's admission that he was aware that Latif usually carried a weapon.

## B. Accomplice Liability

Petitioner's statements describing his behavior at the pharmacy did not clearly implicate him in criminal activity as an accomplice. Though he responded affirmatively during the interrogation to suggestions by A.D.A. Guzman that, in standing by the window and by looking outside, he was acting as a "lookout," he ultimately disowned that characterization of his role in the crime. A fair reading of petitioner's statement is that it merely confirmed that Latif ordered him to stand by the door and not let anyone in. There is no evidence in the record that he obeyed such an order.[6]

In addition, petitioner's statement suggested that, rather than assist in the perpetration of the crime, he searched for an excuse to leave the crime scene. Though petitioner warned the others that he had observed police cars in the vicinity, he clarified that he did this in order to dissuade Latif from continuing with his "harm," and claimed that actually there were not any police cars nearby. This description of petitioner's behavior is not consistent with the mental state of a person intending to facilitate the commission of a crime. *See People v. Hudson*, 95 A.D.2d 688, 463 N.Y.S.2d 799 (1st Dept.1983) (reversing conviction of defendant accused of being lookout during robbery since "[t]here is no firm evidence that defendant 'intentionally aided in some manner in the commission of' this crime") (citing *People v. Valerio*, 64 A.D.2d 516, 406 N.Y.S.2d 481 (1st Dept. 1978)). Under New York law, "[m]ere 'knowledge of what's going on' or 'participating' with robbers by 'taking them away from the scene' of their criminal activity is insufficient to establish criminal liability by one person for the conduct of another. More is necessary. In such circumstances, for the defendant to be responsible under criminal law it must be established that the defendant intentionally aided in some manner in the commission of the robbery 'with the mental

culpability required for the commission (of that crime)' (Penal Law, § 20.00)." *Valerio*, 406 N.Y.S.2d at 483. Petitioner's statement does not evidence such mental culpability.

Rodriguez's statement, in contrast, drew a different picture of petitioner's activities during the crime. According to Rodriguez, petitioner was a "lookout" during the crime: "Milton came back in and he said there were DTs [detectives] around the corner, something like that in a beige car." Upon receiving this information, Latif was spurred to "do it quicker." Thus, unlike petitioner's account of his role in the events at the pharmacy, Rodriguez's account clearly portrayed petitioner as an accomplice who facilitated the commission of the crime. Rodriguez's statements provided a significantly stronger (though inadmissible) evidentiary foundation on which to find that petitioner had taken steps to facilitate, aid, or abet the crime. Coupled with Rodriguez's earlier statements regarding the petitioner's agreement to commit the crime ("they were down" with the plan), Rodriguez's statements established the elements needed to convict petitioner of felony murder.

The facts of this case are similar to those in *Holland v. Scully*, 797 F.2d 57 (2d Cir. 1986). There, the Second Circuit reversed the district court's denial of a writ of habeas corpus to Holland, the petitioner, who was convicted of felony murder in a trial with two co-defendants. Statements from all three defendants were admitted at the trial and contained many similarities in their factual descriptions. But while Holland admitted knowing that his co-defendants had planned a robbery, "Holland denied any participation in the robbery, [although] he did admit that he had some additional involvement after the fact." *Id.* at 60. His co-defendants, however, expressly implicated him in both the planning and the robbery. In his summation, the prosecutor encouraged the jury to consider all of the statements as a group against all of the defendants. *Id.* at 62. Based on these

---

**6.** *See* Trans. (Ponzi: 532): Q. "You said that my client told you that he was informed not to let anybody in. Is that what you said? A. Yes. Q.

Did he tell you that he prevented anybody from coming in? A. No."

errors,[7] the court found that "Holland's trial was infected by a serious *Bruton* violation." *Id.* at 66. The court found it significant that "nowhere in his confession did Holland ever admit that he induced his co-defendants to commit—or even that he participated in the planning of—the crime." Therefore, the court concluded that "It is not at all clear . . . whether the jury would have inferred from Holland's statements the mental culpability necessary to convict him of aiding and abetting under N.Y.P.L. § 20.00, which in turn established his personal liability for the offense that he allegedly solicited—felony murder." *Id.*

A similar analysis, though of course one applying the more stringent *Brecht* standard of review, is warranted here. The record, stripped of Rodriguez's damaging statements, is devoid of any evidence that Cotto knew that a robbery was about to occur, much less that he had agreed to participate in it. Instead, petitioner stated that he "had no idea what Latif was talking about" and interpreted Latif's statement that he planned to "crack Doc's neck" as a joke. Nor does petitioner's statement by itself establish that he participated in the commission of an attempted robbery.

While petitioner assented to Guzman's suggestion that he was a "lookout," the statement in context suggests that petitioner was concerned with leaving the scene rather than assisting in the crime. In short, despite Guzman's repeated efforts to get petitioner to admit to being a "lookout" during the crime, petitioner never actually adopted that characterization of his behavior, and ultimately rejected that description, saying: "I didn't even call that a lookout." A1974, at 34–35. Though petitioner answered in the affirmative at points in his statement to the leading questions of the interrogating A.D.A., the court believes that a fair reading leads to the conclusion that petitioner's statement exculpates him. Specifically, it represents that petitioner had no foreknowledge of the crime, and that once he perceived that a crime was in fact being committed, he not only sought to escape participation in it, but attempted to discourage his cohorts from continuing with its commission.

## C. Prosecutor's summation

Not only did admission of Rodriguez's statements at trial presumably undermine the credibility of petitioner's statements in the eyes of the jury, but the damage to petitioner's case was magnified by the manner in which the prosecutor used Rodriguez's statements against petitioner. The prosecutor's summation focused extensively on the supposedly identical admissions of Cotto and Rodriguez, and attributed statements made by Rodriguez to Cotto. For instance, the prosecutor stated that Cotto and Rodriguez said that:

> Yeah, we did know. We were at Kareem's house, and yes, we knew there was going to be a robbery, and yes, we know that Latif carries a gun, and yes, we agreed to the robbery and to cracking Doc's neck. Yes, we were there, we were down, we agreed, we went there, but it was only a joke. All this is a joke.

As the preceding examination of the co-defendants' statements makes clear, this blanket attribution is misleading. The first statement, that Cotto and Rodriguez knew there was going to be a robbery, was made by Rodriguez alone. The next statement, that "we know that Latif carries a gun," referred to a statement made by petitioner, but in a context in which the jury also knew that Rodriguez admitted to having seen the gun that very day, a fact which made petitioner's admission of general knowledge more likely to be construed as a statement of prior agreement to commit a crime. The first half of the following statement, that "we agreed to the robbery," was again made by Rodriguez alone. The second half of the statement, that petitioner and Rodriguez had also agreed to "crack Doc's neck" referred to statements made by petitioner and Rodriguez, but implied an agreement to it that only Rodriguez's statement could support. Of the next series of statements, "we were

---

**7.** The court applied the pre-*Brecht* standard of review, which is more lenient than the *Brecht* standard that now governs.

there" could properly be attributed to both co-defendants, but "we were down" could properly be attributed only to Rodriguez; "we agreed" should have been attributed only to Rodriguez, while "but it was only a joke," was petitioner's statement alone. Thus, by interweaving the admissions made by Rodriguez regarding Rodriguez's knowledge and state of mind with petitioner's claim that he took Latif's threat to "crack Doc's neck" not to be serious, the prosecutor's summation created a strong impression that petitioner admitted knowing about the entire plan and even found some degree of humor in its perpetration. Because such an impression is not consistent with the evidence in the record, the prosecutor's summation magnified the prejudice suffered by petitioner because of the admission of co-defendant Rodriguez's statements, which themselves undoubtedly "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 113 S.Ct. at 1713–14.

The prosecutor's conflation of the substance of the statements made by Cotto and Rodriguez, where the statements made by Rodriguez were indisputably more incriminating to Cotto than Cotto's own statements, caused "actual prejudice" to the petitioner, and made it impossible for petitioner to receive a fair trial. The danger that the prosecutor's conflation of the co-defendant's statements would prejudice the jury against Cotto was "doubly compounded" by the fact that the confessions of the two defendants had major points of factual overlap. *Id.* at 68. The Second Circuit noted in *Holland*, "[i]t strains our credulity to believe that, in the circumstances, the jury could fairly evaluate the defendants' differing versions of the ... robbery," *id.*, and the court draws the same conclusion from the circumstances of this case.

D. Rodriguez's *Bruton* claim

In a motion similar to petitioner's, Rodriguez claimed to have suffered sufficiently

prejudicial error because of admission of Cotto's statements to warrant reversal of his conviction. The Second Circuit, in *Rodriguez v. Mitchell*, 95–2310 (Unpublished Summary Order) (Feb. 23, 1995), rejected this argument. According to the Second Circuit, "appellant [Rodriguez]'s own statements, standing alone, established each element of the crimes of which he was convicted, and those statements were both repeated and corroborated." *Id.* at 1–2.

Respondent here argues that the Second Circuit's conclusion in Rodriguez's case forecloses a finding in this case that Cotto suffered actual prejudice. Respondent's argument is not logical. It was the lack of incriminating evidentiary content in Cotto's statement, combined with the incriminating content of Rodriguez's statement, which led the Second Circuit to conclude that admission of Cotto's statements failed to harm Rodriguez. As the Second Circuit noted, Rodriguez's statements alone were sufficient to establish each element of the crime. As explained above, the same is not true of petitioner's statements which, taken in context, do not establish either agreement or participation in the crime. Moreover, Rodriguez's statement was corroborated by the testimony of Sandra Nieves, to whom Rodriguez had confessed. Nieves further implicated Rodriguez in the crime by testifying that he had told her that he had dragged DeGennaro back to Latif and held her while she was murdered. Given this, the admission of Cotto's statements, which hardly mention Rodriguez and provide no additional incriminating evidence beyond merely corroborating the factual context in which the events occurred, did little further harm to Rodriguez. Nieves's testimony alone might have been sufficient to convict Rodriguez, but her testimony did not implicate petitioner at all. Nor was there any other evidence available to demonstrate petitioner's participation in the crime or in its planning.[8] Thus, whereas the evidence stripped

---

8. The respondent's claim to the contrary is incorrect. Respondent points to "the discovery in the drugstore of a partially opened cash register, ... a crumpled five dollar bill near Rose DeGennaro's body," and "the recovery of pharmacy sta-

tionery from the street along which petitioner and his cohorts fled" as corroboration of petitioner's "confession." *See* Respondent's Mem. of Law, at 16–17. Neither the opened cash register, however, nor the crumpled five dollar bill

of the *Cruz* error, *i.e.* petitioner's statements, in the record against Rodriguez was overwhelming, the evidence against petitioner, cleansed of Rodriguez's statements, was neither overwhelming nor even weighty.

The Supreme Court has recently counseled "that in cases of grave doubt as to harmlessness the petitioner must win," *O'Neal, v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Thus, even were the court to consider this a close case, it would be required to rule in petitioner's favor. But this case is not close.

The weight of the evidence stripped of the *Cruz* error does not support conviction. Petitioner gave a statement to law enforcement officers that established his presence at the scene of a brutal crime. However, on the key points regarding petitioner's knowledge of and participation in the crime itself, petitioner's statement is, on balance, exculpatory. Petitioner denied knowing that a crime was planned, stating that he believed his cohorts were joking. Though he assented at one point to his interrogator's suggestion that he was a "lookout," that characterization is inconsistent with his description of his activities during the crime itself, where his main concern appeared to be finding a way to escape the crime scene, or to interrupt the crime, without incurring the wrath of his armed companion. Though respondent characterizes petitioner as having informed his co-defendants of the activities of police officers in the area, and thereby having fulfilled his role as a lookout, petitioner's statement indicated that the only time he reported police activity, he had fabricated the warning in an effort to dissuade Latif from committing the crime. Taken on its own terms, therefore, petitioner's statement does not show the intent or agreement necessary to sustain a conviction for armed robbery and felony murder.

provided any clear evidence of a robbery in progress. The fact that money was left in the cash register and crumpled on the floor could as easily indicate that the defendants were not interested in stealing money. Further, petitioner's statement makes no mention of stationery. Thus, the discovery of abandoned stationery along the escape route taken by *all of the co-defendants* proves nothing with regard to petitioner, espe-

Moreover, unlike all the other defendants at trial, there was no separate and admissible evidence in the record inculpating petitioner or corroborating whatever inculpatory elements his statement contained. The only evidence implicating Cotto other than his own statement are the statements made by Rodriguez.

Rodriguez's statements inculpate petitioner on each of the key points. Rodriguez stated that petitioner, like he, was "down" with the plan to rob the pharmacy. Rodriguez stated that he saw Latif with the gun prior to the shootings. When asked if petitioner was the lookout, Rodriguez answered in the affirmative, and then described petitioner's actions in such a way as further to confirm that petitioner played that role. At no time did Rodriguez's statement indicate the lack of knowledge, lack of agreement, hesitation or non-cooperation communicated in petitioner's own statement.

By treating petitioner's statements and Rodriguez's statements as interchangeable, the prosecutor encouraged the jury to do the same. The prosecutor joined the two defendants together in virtually every reference to them in summation, and attributed highly incriminatory statements to petitioner that were made only by Rodriguez. Accordingly, the court concludes that the *Cruz* error committed in petitioner's trial caused "actual prejudice" to petitioner, and that the error had a substantial and injurious effect in determining the jury's verdict.

## CONCLUSION

For these reasons, the court GRANTS the petitioner's application for a writ of habeas corpus unless the state grants petitioner a new trial within sixty (60) days. The Clerk

cially given the fact that Latif's fingerprints, not petitioner's, were found on the stationery. *See* Trans. (McCloud: 852, 859). More importantly, even if the open cash register, the crumpled five-dollar bill, and the abandoned stationery did confirm that a robbery was attempted by someone, it would nonetheless fail to support an inference that petitioner had agreed to participate, or did participate, in that attempted robbery.

of the Court is directed to enter judgment accordingly.

SO ORDERED.