Byron ORTIZ, Petitioner,

v.

**Christopher ARTUZ, Superintendent, Green Haven Correctional Facility, Respondent.**

**No. 97 CV 2261(NG).**

United States District Court, E.D. New York.

Sept. 8, 2000.

330

Byron Ortiz, pro se.

Lisa Drury, Queens DA, Queens, NY, for defendant.

## ORDER

GERSHON, District Judge.

Petitioner Byron Ortiz seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, along with his codefendant Danny Torres, was convicted on February 24, 1993 after a jury trial of Murder in the Second Degree (depraved indifference) (N.Y.Penal Law § 125.25[2]) and Criminal Possession of a Weapon in the Second Degree (N.Y.Penal Law § 265.03). Both he and Torres were acquitted of intentional murder. The victim was Danny Rojas, who was shot in the head from a passing car while standing on a sidewalk with a group of people. Petitioner was sentenced to concurrent indeterminate prison terms of twenty-five years to life for the murder, and five to fifteen years for the weapon possession. He raises nine grounds that he claims undermine the validity of his convictions: (1) and (4) the police lacked probable cause for petitioner's arrest, and the subsequent identification of petitioner and petitioner's statements must be suppressed as fruits of an illegal arrest; (2) the identification procedure used by police was impermissibly suggestive and rendered the witness's identification unreliable; (3) petitioner did not give a knowing, voluntary and intelligent waiver of his *Miranda* rights so as to validate the use of his statements; (5) petitioner was deprived of his rights to due process and a fair trial by the state trial court's failure to properly respond to the jury's request for instructions; (6) petitioner's guilt was not proven beyond a reasonable doubt; (7) petitioner was deprived of his right to the effective assistance of counsel when his defense counsel slept during the trial; (8) petitioner was deprived of his right to due process and a fair trial by the introduction of uncharged crimes and prior bad acts; (9) statements of the non-testifying codefendant were improperly admitted; and (10) the Appellate Division denied petitioner's right to adequate appellate review of disputed issues of law and fact by refusing to allow petitioner to submit a *pro se* supplemental reply brief during the appeals process.

*The Pretrial Hearing*

The evidence at the hearing was as follows:

On September 24, 1991, Detectives Richard Sica and Raymond Murtha approached petitioner on the corner of 150th Street and Hillside Avenue in Queens, and told him that they wanted to speak to him about several outstanding complaints against him. Sica testified that petitioner accompanied the detectives to the 103rd Precinct at about 3:00 p.m., where Detective Murtha arrested him on two unrelated outstanding criminal complaints for menacing and reckless endangerment. Detective Murtha had been assigned to those outstanding cases, and the complainants in those cases had identified petitioner as the perpetrator. However, Detective Murtha did not recall placing Ortiz under arrest himself. Petitioner's counsel placed into evidence Detective Sica's booking sheet from the night of September 24, 1991, which indicated that petitioner was arrested for Murder in the Second Degree at 3:00 p.m. Sica denied the accuracy of this report.

Previously, Karina Veliz had advised Detective Sica that she had seen the man who shot Danny Rojas. She identified the man as petitioner, said she had known the petitioner for several years and she described him and his home. At approximately 6:45 p.m., on September 24th, Veliz came to the precinct and observed petitioner through a one-way glass window and identified him to Detective Sica as the one who had shot Danny Rojas. Sica testified that at approximately 7:50 p.m. he arrested petitioner for Rojas's murder and advised petitioner of his *Miranda* rights. Detective Sica told Ortiz that he had been identified by witnesses and asked if he wanted to tell

him what happened the night Danny Rojas was shot.

Petitioner twice orally described his version of the events surrounding Danny Rojas's murder. During the second recitation, Detective Sica transcribed the story. Petitioner then read the written transcription and signed it. The statement read,

I don't remember the date it was at night. We were drinking me, Jose, and a third person I won't mention. I got a gray car from someone it was a medium size car I don't remember what type. I was driving another person was sitting next to me in the passengers seat and Jose was in the back. I drove around by the park. I drove down 153 St once, then I passed by again. As I drove by the second time, Jose took out a black gun and fired one shot when we got to 90 Av. There was people standing on 90 Av. across from the park. When I first heard the shot I slowed then I got scared and drove away fast, towards Hillside Av. We started arguing I said why did you shot. After we argued I drove the car to Kew Gardens and left it.

Petitioner subsequently identified Jose Martinez as the shooter, and Danny Torres as the third person in the car.

On June 5, 1992, the hearing court rendered a written decision denying petitioner's motion to suppress the identification of petitioner and petitioner's statements. In its findings of fact, the court found that Sica had arrested petitioner on the corner of 150th Street and Hillside Avenue. The court concluded that there was probable cause to arrest petitioner at this time because the eyewitness to Danny Rojas's murder was personally acquainted with petitioner and had identified him by name. Moreover, the court found that petitioner had knowingly and intelligently waived his *Miranda* rights before making statements to the police. Finally, because the eyewitness to Danny Rojas's murder had known petitioner for years and identified him by name, the hearing court held that the iden-

tification was confirmatory, and as a result there was no issue as to suggestiveness.

*The Trial*

The People's evidence was as follows:

On April 28, 1991, approximately forty guests, including Eric Oliva, Angel Ruiz, Karina Veliz, and Alexander Rosales, attended a party at 89–51 153rd Street. The party ended at 11:00 p.m., and a crowd of people exited the building. Danny Rojas, who had not attended the party, spoke to several of these people outside of the building. He was speaking to Karina Veliz as a car with tinted windows drove down 153rd Street.

Eric Oliva testified that he heard a pop, followed by screams of "Danny got hit." Oliva turned around and saw Rojas falling down, then noticed the car driving away and ran after it. He testified that the car was going only around 2 miles per hour, then slowly began to take off. He could see only the back and driver's side of the car and could not see inside the car, because the back and driver's side black tinted windows were closed. Alex Rosales also did not see the car until he heard the pop, and joined Oliva in chasing after it.

Angel Ruiz testified that he saw the car passing by very slowly before the shot was fired. He heard the pop and saw a flash in the back passenger-side window of the car. Although the car's window's were tinted, he could see the flash because the back passenger-side window was partially open. Ruiz further testified that there had previously been some conflict between the group of people exiting the party and a group with which the defendants associated.

Karina Veliz testified that the front passenger-side window of the car was open, and through it she could see two individuals in the front seat. She recognized the driver as codefendant Torres, and the front seat passenger as petitioner. She had known both individuals for five years from the neighborhood, and codefendant Torres had attended high school with her.

Veliz testified that, as the car drove by, petitioner fired a handgun out of the front passenger-side window. It seemed that the car came to a very brief stop, just before the shot was fired, and then sped up again. The shot struck Danny Rojas, and he fell backwards against Veliz. When Detective Sica first interviewed Veliz about the incident, she told him that she did not know who had done it. She testified that she lied to Sica because she was frightened, and that she had previously been threatened. Veliz testified that she later spoke to Sica a second time about these events when she went to the 103rd Precinct to file a complaint.

Detective Sica testified that, after speaking to Veliz on September 24, he had occasion to speak to petitioner. Sica testified that he read petitioner his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that petitioner waived these rights and made an oral statement. Petitioner made a correction to his statement and signed the transcription. Sica read this statement (quoted *supra* at pp. 332–333) in court.

Detective Sica also read codefendant Torres's oral statement, in court, in which Torres admitted to being in the car when Rojas was shot, but claimed that petitioner was driving and that Jose Martinez shot Rojas. This statement read:

A while ago, a few months back I was at 150th Street, 89th Avenue. Byron drove up in a two-door gray car. The guy in the back seat, I think Jose was also in the car. We drove around the area for about an hour. It was dark out, about 12:00 midnight. Then Jose said: Let's pass by 153rd Street. Byron drove up from Archer Avenue on 153rd Street. Jose rolled the passenger side window down a little. Jose pulled out a black gun. I think Jose said: Slow down. When we got by the entrance of the park, Byron slowed down. Jose fired one shot in the crowd and then Byron sped off towards Hillside Avenue and turned left. Then Byron drove me

home in Brooklyn. Both Byron and Jose stayed with me in Brooklyn. They left the next day. We were drinking before the shooting. We never had a problem Danny Rojas. We had problems with George and Alex, but I settled my problem with George.

Detective Sica also testified that he conducted an investigation of Jose Martinez and interviewed Martinez about Rojas's death, but never arrested him.

Torres called one witness, as to his character. Ortiz called none. Petitioner's counsel challenged Veliz's credibility on cross-examination and during his summation, emphasizing her failure to identify the perpetrators immediately after the accident and the inability of any of the other witnesses to identify the perpetrators. Counsel claimed that it was impossible for Veliz to see into the car, given the conditions present at the time of the shooting, and urged that Veliz had a motive for lying, because petitioner had been cooperating with the Queens County District Attorney's Office in its prosecution of Veliz's friend, Alex Rosales. Counsel also challenged the voluntariness of petitioner's statement, arguing that he was intimidated by being held in custody for many hours and claiming that Sica edited his statement to make it more inculpatory.

*Procedural History*

In March, 1995, petitioner filed his direct appeal with the Appellate Division, Second Department, in which he claimed the following: a) the police arrested petitioner without probable cause; b) the identification procedure was unduly suggestive; c) petitioner's statement should have been suppressed given his limited command of the English language; d) the results of the identification procedures and petitioner's statements should have been suppressed as "fruit of the poisonous tree"; e) the court's failure to meaningfully respond to the jury's note deprived petitioner of a fair trial; f) the evidence was insufficient to establish petitioner's guilt beyond a reasonable doubt, and the verdict

was against the weight of the evidence; and g) petitioner's sentence was excessive. In February, 1996, petitioner, *pro se*, filed a supplemental brief with the Appellate Division, in which he claimed: a) that he was denied the effective assistance of trial counsel; b) that he was denied a fair trial because the prosecutor failed to request a hearing prior to eliciting evidence of petitioner's uncharged crimes; and c) the court's failure to order that petitioner's trial be severed from his codefendant's denied petitioner a fair trial.

After the People filed their response to petitioner's *pro se* supplemental brief, petitioner sought leave to file a *pro se* supplemental reply brief to respondent's brief. In an order dated June 13, 1996, the Appellate Division, Second Department, denied petitioner's application. Thereafter, petitioner sought leave to appeal the Appellate Division's order to the New York State Court of Appeals. On September 25, 1996, petitioner's leave application was dismissed. *People v. Ortiz*, 88 N.Y.2d 1023, 651 N.Y.S.2d 22, 673 N.E.2d 1249 (1996).

On July 8, 1996, a four-judge panel of the Appellate Division, Second Department, affirmed petitioner's judgment of conviction. *People v. Ortiz*, 229 A.D.2d 451, 644 N.Y.S.2d 794 (2d Dept.1996). The court found that, viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt. The court further found that the verdict was not against the weight of the evidence. In addition, the Appellate Division held that the hearing court properly found that the police had probable cause to arrest petitioner, and it held that petitioner's sentence was not excessive. Finally, the court determined that petitioner's remaining contentions were unpreserved for appellate review, without merit, or constituted harmless error.

Petitioner then moved for leave to appeal to the New York Court of Appeals. In a certificate dated November 27, 1996, the Court of Appeals denied petitioner's leave application. *People v. Ortiz*, 89 N.Y.2d 866, 653 N.Y.S.2d 289, 675 N.E.2d 1242 (1996) (Simons, J.).

## DISCUSSION

### Fourth Amendment Claim

 Petitioner argues that he was arrested without probable cause in violation of the Fourth Amendment and that his pretrial statement and the identification procedure should have been suppressed as the fruit of the illegal arrest. A Fourth Amendment claim arising from a state criminal conviction is barred from federal habeas corpus review unless the State denied the petitioner a full and fair opportunity to litigate the claim. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). A federal court is not permitted to judge the merits of the state court's decision. *See Capellan v. Riley,* 975 F.2d 67, 71 (2d Cir.1992). The court need find only that the State's procedure for resolving Fourth Amendment claims is "facially adequate" and that no "unconscionable breakdown" of the process occurred in the petitioner's case. *See id.* An unconscionable breakdown occurs when the state court fails to conduct a reasoned inquiry into the petitioner's claim. *See Papile v. Hernandez,* 697 F.Supp. 626, 633 (E.D.N.Y.1988).

Federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y.Crim.Proc.Law § 710.10 *et seq.* (McKinney 1995), as being facially adequate. *See Capellan,* 975 F.2d at 70, n. 1. Therefore, "federal scrutiny of [petitioner's] Fourth Amendment claim[ ] is not warranted unless he demonstrates that he was in fact precluded from utilizing [that procedure] by an unconscionable breakdown in the review process." *Shaw v. Scully,* 654 F.Supp. 859, 863–64 (S.D.N.Y. 1987).

Here, petitioner availed himself of the procedures set forth in Section 710.10 *et.*

seq., and the state courts conducted a reasoned inquiry into the relevant questions of facts and law. On May 28, 1992, the court held a pretrial hearing where evidence concerning the circumstances surrounding petitioner's arrest were introduced. Detectives Sica and Murtha both testified at this hearing. Petitioner's counsel cross-examined Detective Sica and asserted that the People failed to meet the burden of proving probable cause. On June 5, 1992, in a detailed written opinion setting forth findings of fact and conclusions of law, the trial court denied petitioner's motion to suppress the identification of petitioner and petitioner's statements. In its findings of fact, the court stated that on September 24, 1991, Detective Sica spoke to a woman who had been present at the scene of the shooting and viewed petitioner and codefendant in the front seat. The court found that, later that day, Sica arrested petitioner on the corner of 150th Street and Hillside Avenue and brought him to the 103rd Precinct. The hearing court ruled that there was probable cause for the arrest, because the eyewitness to Danny Rojas's murder was personally acquainted with petitioner, was in a place where she could clearly see the incident, and identified him by name. The Appellate Division subsequently affirmed the hearing court's ruling on the merits. *People v. Ortiz*, 229 A.D.2d 451, 644 N.Y.S.2d 794. Since the hearing transcript and the opinion of the hearing judge both reflect a "reasoned inquiry" into petitioner's claims, petitioner was not the victim of an unconscionable breakdown in state procedure and his Fourth Amendment claim is unreviewable by this court.

Petitioner asserts that an unconscionable breakdown occurred in this case because the hearing court relaxed the prosecution's burden of establishing the validity of petitioner's arrest. Petitioner charges that the hearing court validated the arrest without the slightest evidence to substantiate the prosecution's burden, because neither Detective Sica nor Detective Murtha testified to the specific acts that formed the basis of the outstanding complaints alleged by Sica as the basis for the initial arrest. This is irrelevant, because the hearing court did not rely on this pretextual arrest, but rather found that there was probable cause to arrest petitioner for the Rojas murder. Petitioner also alleged that the police lacked probable cause to arrest him for homicide at 3:00 p.m., arguing that Veliz never spoke to Sica about petitioner's involvement in the crime until she arrived at the Precinct at 6:45 p.m., three and a half hours after the arrest. (Petitioner's Memo, 13). However, the hearing court explicitly stated in its findings of fact that the witness spoke to Sica and identified petitioner prior to the arrest, and under 28 U.S.C. § 2254(e)(1) this finding of fact by the state court is supported by Sica's testimony and "shall be presumed to be correct" in a federal habeas corpus proceeding.

Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim on the merits and was not victim to an unconscionable breakdown in state procedure. The hearing court conducted a reasoned inquiry into petitioner's claim and determined that there was probable cause for the arrest, and the Appellate Division affirmed on the merits. Thus, petitioner's Fourth Amendment claim is unreviewable by this Court.

**Identification**

▇ Petitioner claims that Veliz's identification of him at the 103rd Precinct was impermissibly suggestive and that the improper procedure rendered her identification unreliable. After Detective Sica brought petitioner to the Precinct, Veliz viewed him through a one-way glass and confirmed that he was Byron Ortiz, the man whom she had seen shoot Danny Rojas. The hearing judge held that, because this identification was confirmatory in nature, the issue of suggestiveness was not pertinent.

▇ Due process of law, required in state criminal proceedings under the Four-

teenth Amendment to the United States Constitution, mandates that eyewitness identification evidence is not reliable and must be suppressed "if suggestive identification procedures have led to a very substantial likelihood of irreparable misidentification." *Kirby v. Illinois*, 406 U.S. 682, 691, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The admission of testimony concerning a suggestive identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Even an impermissibly suggestive pretrial identification procedure does not render an identification inadmissible in court if, considering the totality of the circumstances, there is sufficient evidence of reliability apart from the tainted identification. If so, the identification is admissible independent of the suggestive nature of the pretrial identification. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

 Five factors to be considered as independent indicia of the reliability of a witness's identification are: 1) the opportunity of the witness to view the suspect at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time elapsed between the crime and the confrontation. *See Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375; *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243. Another important factor affecting the reliability of an identification is the prior familiarity the witness has with the accused. *See Minetos v. Scully*, 625 F.Supp. 815, 819 (S.D.N.Y.1986).

I agree with the state trial judge that the identification in this case was essentially confirmatory in nature, and although one-on-one show-ups are suggestive, *Stovall v. Denno*, 388 U.S. 293 at 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), under the totality of the circumstances in this case, the record establishes that the identification was reliable.

Important in finding that the identification was confirmatory and reliable is that Veliz had known petitioner for several years from the neighborhood. Prior to petitioner's arrest, Veliz informed Detective Sica that she witnessed petitioner, whom she identified by name, fire the shot that killed Danny Rojas. She gave the detective a physical description of petitioner and told him where petitioner lived. The detective, who was previously acquainted with petitioner, recognized the witness's description. Because Veliz had affirmatively identified petitioner by name and had given a description of him prior to seeing him at the precinct, the identification procedure did not create a substantial likelihood of misidentification.

Moreover, there are other indicia of the reliability of the identification. Petitioner alleges that Veliz did not have an adequate opportunity to view him under the conditions present at the time of the shooting. However, even "[a] mere glance would be sufficient for identification." *Gonzalez v. Hammock*, 639 F.2d 844, 847 (2d Cir.1980), *cert. denied*, 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981) (witness had sufficient opportunity to focus his attention for a few seconds as defendant was pulling a shotgun from bag); *see also Coleman v. Alabama*, 399 U.S. 1, 4, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (witness had brief but clear view of criminal on dark highway under passing headlights). Here, Veliz witnessed the car from which the shot was fired driving up 153rd street at approximately two miles per hour. The car made what appeared to be a brief stop just before the shot was fired. It was a clear night, and the area was well-lit. The front, passenger-side window was down, and Veliz saw the two defendants, whom she recognized from the neighborhood. The witness was able to instantly recognize the defendants because she knew them both previously. Veliz's degree of

attention was enhanced because she recognized both of the defendants. The accuracy of Veliz's pre-confrontation description of petitioner strongly supports a finding of independent reliability. Veliz gave Detective Sica, who was acquainted with petitioner himself, an accurate physical description. The witness's level of certainty at the challenged identification was high. Though the time between the shooting and the confrontation here weighs against the reliability of the identification under the *Biggers* analysis, the totality of the circumstances demonstrates that Veliz's identification of petitioner was reliable and therefore admissible at trial.

### *Miranda* Rights

 Petitioner claims that, because of his limited command of the English language, he did not give a knowing, voluntary and intelligent waiver of his *Miranda* rights. Detective Sica testified at the suppression hearing that he had interviewed petitioner once prior to petitioner's arrest on the instant case. He also testified that petitioner affirmatively indicated, in English, that he understood each of the Miranda warnings, which were read to him in English. Petitioner gave his own rendition of the events in question in English and signed the written transcription of that version after apparently reading it. Sica testified that he asked all questions of petitioner in English, and petitioner never told him that he did not understand English. The hearing judge's findings of fact demonstrate that he credited Sica's testimony. The judge found that petitioner was read his *Miranda* rights and agreed to make a statement. He told Detective Sica what happened and repeated it while Sica wrote it down, and this written statement was read and signed by petitioner. These findings of fact are clearly supported by the record.

 Once in the custody of law enforcement officials, an accused must be informed of his constitutional rights to remain silent and to counsel, and a waiver of those rights, to be effective, must be voluntarily, knowingly and intelligently made. *Colorado v. Spring*, 479 U.S. 564, 572–573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). While the voluntariness of a habeas petitioner's confession is a question of law entitled to *de novo* review by a federal court, subsidiary factual questions relevant to this determination are entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *see also Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995) (while voluntariness of a confession is a question of law, "what happened" issues are entitled to the presumption of correctness). Because subsidiary questions (such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and the defendant's familiarity with the *Miranda* warnings) often require the resolution of conflicting testimony of police and defendant, the law is clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record. *Miller*, 474 U.S. at 117, 106 S.Ct. 445. It is a petitioner's burden to overcome the presumption of correctness by showing that the state court's holding was wrong by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Petitioner contends that the following exchange during Karen Veliz's testimony is sufficient to rebut the presumption of correctness:

Q: Have you ever socialized with Mr. Ortiz?

A: Never, thank God.

Q: Did you ever really speak to Mr. Ortiz?

A: I know who he is. I saw him.

Q: Did you ever speak with him?

A: He doesn't know how to speak English, so, I couldn't hold a conversation with him.

Petitioner's argument that this testimony constitutes clear and convincing evidence that petitioner does not speak English is meritless. Veliz testified that, though she knows who petitioner is, she never actually socialized or spoke with him. Thus, her belief that he does not speak English is not sufficient to negate the testimony of Detective Sica, who conversed with petitioner on more than one occasion.

**Jury Questions**

Petitioner claims that the trial court deprived him of his right to a fair trial because it failed to adequately respond to questions from the jury and simply repeated portions of the original charge. The court received two notes during the jury's deliberations. The first read: "What is the definition of intent? What is the definition of reckless murder? Can the defendants be considered guilty of reckless murder even if neither shot the gun? Please explain acting in concert according to the law. Is failure to report a shooting while driving in the car considered to be reckless according to the law?" The court responded by having the court reporter read back to the jury relevant portions of the court's instructions on the law. Later, the jury directed another note to the judge, asking "what does the law state regarding criminal possession of a weapon in the second degree?" and "can a defendant be found guilty of criminal possession of a weapon just by being in the car where a gun that was used for a murder is present?" The court responded by having the court reporter re-read the instructions on criminal possession of a weapon in the second degree and acting in concert.

■■■■ The scope of review on a habeas petitioner's claim that he was deprived of a fair trial by errors in the charge to the jury is very narrow. *Estelle v. McGuire*, 502 U.S. 62, 73, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). In reviewing a claim that a jury charge was erroneous, the only question is "whether the ailing instruction by

itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The instruction "may not be judged in artificial isolation" but must be considered in the context of the instruction as a whole and the trial record. *Id.* at 147, 94 S.Ct. 396.

■■ The determination of the appropriate answer to a jury question rests within the discretion of the trial court, so long as the answer does not deprive the defendant of a constitutional right. *See McShall v. Henderson*, 526 F.Supp. 158, 161 (S.D.N.Y.1981). As the Supreme Court said in *United States v. Bayer*, 331 U.S. 532, 537–38, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947):

> Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. How far any charge of technical questions of law is really understood by those of lay background would be difficult to ascertain, but it is certainly more evident in the living scene than in a cold record.

The trial court was within the broad range of discretion afforded it in responding to the jury's requests. The jurors did not seek further clarification on any issues after the relevant portions of the original charge were read back to them. Moreover, the court's original charge did not merely read the statutory definition of the crimes, but rather explained the relevant concepts.

Petitioner's reliance on *Bollenbach v. United States*, 326 U.S. 607, 612–613, 66 S.Ct. 402, 90 L.Ed. 350 (1946) is misplaced. In *Bollenbach*, the trial court gave an erroneous instruction respecting the very matter that perplexed the jury. *See Bollenbach*, 326 U.S. at 613, 66 S.Ct. 402; *See also United States v. Hall*, 346 F.2d 875,

879 (2d Cir.1965). Here, there is no claim that the court's instructions were legally incorrect.

**Sufficiency of the Evidence**

 A district court may grant habeas corpus relief only if it finds, upon the record evidence adduced at trial, that no rational trier of fact could have found proof beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This question must be reviewed in the light most favorable to the prosecution. *See id.* at 319, 99 S.Ct. 2781. To determine the essential elements of the crime, the habeas corpus court must look to state law, *see id.* at 324 n. 16, 99 S.Ct. 2781, and the evidence must be reviewed as a whole. *See Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). "Assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments on both of these issues." *Id.* When faced with a record from which conflicting inferences may be drawn, the habeas corpus court must presume, even if the record does not show it affirmatively, that the trier of fact resolved the conflict in favor of the prosecution and must defer to that resolution. *See Wright v. West,* 505 U.S. 277, 297, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

Under N.Y.Penal Law § 125.25(2) "a person is guilty of murder in the second degree when ... [u]nder circumstances evincing depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.". New York law also provides that "a person is guilty of criminal possession of a weapon in the second degree when he possesses a ... loaded firearm with intent to use the same unlawfully against another." N.Y.Penal Law § 265.03.

The evidence introduced at petitioner's trial was sufficient to convince a rational trier of fact that the elements of Murder in the Second Degree (depraved indifference) and Criminal Possession of a Weapon in the Second Degree were established beyond a reasonable doubt. Karina Veliz testified that petitioner, whom she had known for about five years, fired the shot that killed Danny Rojas from the front passenger-side window of a slow-moving car. Petitioner's own statement confirmed that he was inside the car. Petitioner claims that the evidence establishing his guilt is insufficient because "Veliz's testimony is incredible as a matter of law." Petitioner argues that Veliz had previously informed Detective Sica that she could not identify the perpetrators because of the dark windows and, although Veliz accounted for this by stating she had been threatened, the prosecution presented no evidence of the threats. The resolution of issues of credibility is exclusively the province of the jury, whose determination may not be overturned lightly. *See United States v. Shulman,* 624 F.2d 384, 388 (2d Cir.1980). Petitioner's counsel vigorously attacked Veliz's credibility on cross-examination and pointed out the issues petitioner now raises. A rational trier of fact could well have decided to credit Veliz's testimony.

Petitioner further claims that it was factually impossible for Veliz to have identified the perpetrators under the circumstances presented, arguing the observation occurred at 11:00 p.m., and from a distance of approximately 31 feet. Petitioner argues that the observation would have been made from behind the deceased and while several people were walking back and forth, and she would have had to see into the dark interior of a car which was being driven under street lighting. Again, all of these arguments were presented to the jury. The People presented evidence that it was a clear, cloudless night, and the area was well-lit by streetlights, building lights, and a flood light on the roof of 89–21 153rd Street. Veliz also testified that her view was not obstructed. Viewing the evidence in the light most favorable to the prosecu-

tion, a rational trier of fact could have found that Veliz was able to accurately identify the perpetrators.

**Ineffective Assistance of Counsel**

 Petitioner argues that he was deprived of his right to the assistance of counsel when his counsel slept during the trial. This allegation arises from an exchange between petitioners's counsel and the Court that followed the jury charge, in which counsel requested that two jurors be removed for allegedly sleeping during the court's charge:

> Mr. Rubenfeld: ... [J]uror number ten slept through it and I'll state unequivocally and so did make my observation. I say juror number six must have slept through eighty percent.
>
> The Court: The Court observed you asleep at times.
>
> Mr. Rubenfeld: No, no, I never slept. I might have pretended.

 To succeed on a claim of ineffective assistance of counsel, the conduct of trial counsel must have so undermined the functioning of the adversarial process that the trial outcome is unreliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show that counsel's performance was deficient and that this deficient performance prejudiced the defense to the extent that petitioner failed to receive a fair trial. *Id.* Failure to make the required showing of either deficient performance or prejudice defeats an ineffectiveness claim. *See id.* at 700, 104 S.Ct. 2052. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052.

 With regard to the determination of prejudice, the court must consider all the evidence and find with a reasonable probability that, absent counsel's deficient performance, the result would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 695, 104 S.Ct. 2052. Ineffectiveness claims are subject to a general requirement that the defendant affirmatively prove prejudice. *Id.* at 693, 104 S.Ct. 2052. *Strickland* recognized, however, that there are some situations where prejudice will be presumed. *Id.* at 692, 104 S.Ct. 2052.

Petitioner relies on *Tippins v. Walker,* 77 F.3d 682 (2d Cir.1996), for the proposition that an attorney's conduct of sleeping during trial may be an instance where prejudice will be presumed. In *Tippins,* the record demonstrated that (1) counsel slept every day of the trial; (2) he slept during the testimony of a critical prosecution witness; and (3) he slept during damaging testimony by a codefendant. *Id.* at 687. Petitioner's reliance on this case is misplaced. To date, courts in the Second Circuit have found per se violations in only two instances: (1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime. *See United States v. Rondon,* 204 F.3d 376, 379–80 (2d Cir. 2000); *United States v. O'Neil,* 118 F.3d 65, 70 (2d Cir.1997); *United States v. Muyet,* 994 F.Supp. 550, 560 (S.D.N.Y. 1998). Although the Second Circuit suggested in *Tippins* that an attorney's sleeping through critical portions of the defendant's trial may constitute ineffective assistance of counsel per se, there is no showing here that counsel's actions reached that level.

The *Tippins* court itself expressed reluctance to extend the rule of per se prejudice and stated that episodes of inattention or slumber are ordinarily amenable to analysis under the *Strickland* prejudice test. *Tippins,* 77 F.3d at 686. However, the court acknowledged that at some point prejudice is inherent because unconscious or sleeping counsel is equivalent to no counsel at all. *Id.* The court excused Tippins' failure to adduce specific attorney errors resulting in prejudice, understanding his claim of prejudice to be not that his

lawyer should have taken any particular initiative, but that, at critical times, Tippins had no counsel to sort out what initiatives were open. *Id.* The court stated that, where the adversary nature of the proceeding was subject to repeated suspensions, there is little difference between saying that prejudice will be presumed and saying that prejudice will be demonstrated, and it concluded that a defendant suffers prejudice if his counsel is repeatedly unconscious at trial for periods of time in which defendant's interests were at stake. *Id.*

Here, there has been no showing that counsel was repeatedly unconscious at trial for periods of time in which petitioner's interests were at stake, and petitioner has not satisfied the *Strickland* prejudice requirement. Petitioner does not state the frequency of counsel's unconsciousness, and does not point to any specific occasion in which counsel slept while petitioner's interests were at stake. Petitioner has not set forth any instances of counsel's unconsciousness himself, nor has he presented any affidavits to this effect. Petitioner relies on the trial court's statement that it observed counsel asleep "at times," an allegation denied by counsel. Even accepting the state court's observation as fact, this case bears no likeness to *Tippins*, where the defense counsel was in a state of unconsciousness throughout the trial. *See Muyet*, 994 F.Supp. at 560. Here, petitioner's counsel repeatedly made objections when the prosecutor examined witnesses and when he delivered his summation. In sum, there is no basis before this court to find that petitioner was prejudiced.

**Prior Uncharged Crimes**

■ Petitioner alleges that he was deprived of his right to due process and a fair trial by the introduction of uncharged crimes and prior bad acts. This claim arises from certain testimony of Karina Veliz. During direct examination, Veliz testified that she did not tell Detective Sica what she knew regarding the murder

when she first spoke to him because she was scared and had been threatened previously. She did not explicitly connect the prior threat to petitioner. Veliz also testified that she told Detective Sica what she knew about the murder when she went to the 103rd Precinct to file a complaint. She did not say on direct examination that she was filing a complaint against petitioner.

During cross-examination, petitioner's counsel asked Veliz when she made her written statement to Detective Sica. She responded "It was when I went to file the complaint against Byron [petitioner]." Petitioner's counsel continued to question Veliz on this matter, clarifying that this was prior to her speaking to Sica. Petitioner's counsel later asked Veliz whether it was true that Alex Rosales, another witness, was known to carry a gun. Veliz responded "[t]he only person who I know who carries a gun—is your client. The person that shot Danny". When petitioner's counsel asked "[y]ou don't like Byron?" Veliz stated "I don't like people who pull guns on me." Reacting to Veliz's testimony during cross-examination, the prosecutor on re-direct asked Veliz of what she was scared. Veliz responded "Both Danny and Byron . . . that they are going to shoot me or doing something like they did to Danny."

Thus, the testimony complained of was elicited in response to questions by the defense, in an effort to challenge the witness Veliz's credibility. That the answers were not helpful to the defense does not invalidate the conviction. Nor does the fact that the prosecution pursued a single question on the subject on redirect.

**Confrontation Clause**

■ Petitioner claims that the court infringed on his constitutional right to confront the witnesses against him when it admitted a statement by a non-testifying codefendant. Respondent concedes that the trial court erred in admitting the codefendant's statement into evidence, but ar-

gues that the admission amounted to harmless constitutional error.

Detective Sica read both petitioner's statement and Torres's similar statement into evidence. The judge gave a limiting instruction that the statement made by each defendant was binding only on him and was not to be considered with respect to his codefendant.

■ "Where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Cruz v. New York*, 481 U.S. 186, 193, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) (internal citations omitted). A codefendant's statement is inadmissible against the defendant even if it is substantially identical to the defendant's own confession. *See Samuels v. Mann*, 13 F.3d 522, 526 (2d cir.1993) (citing *Cruz*, 481 U.S. at 193, 107 S.Ct. 1714), *cert. denied*, 513 U.S. 849, 115 S.Ct. 134, 130 L.Ed.2d 85 (1994).

■ As trial error, violations of the *Cruz* rule are subject to harmless error analysis. *Samuels*, 13 F.3d at 526 (discussing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). In that regard, conclusive effect is not to be given to the reviewing court's view of the evidence, but rather to "the impact that the improperly admitted evidence had or reasonably may have had upon the minds of the jury." 13 F.3d at 528. To conclude that a *Cruz* error is harmless, it need not be found that the improperly admitted evidence had no effect at all in the jury's mind; it need only be found that the effect on the determination of the jury's verdict was not substantial and injurious. *Id.; see Latine v. Mann*, 25 F.3d 1162, 1167 (1994), *cert. denied*, 514 U.S. 1006, 115 S.Ct. 1319, 131 L.Ed.2d 200 (1995).

■ The factors relevant to the determination of whether an error is harmless include "the importance of the … testimony in the prosecution's case, whether the testimony was cumulative, the absence or presence of evidence corroborating or contradicting the testimony, and the overall strength of the prosecution's case." *Latine*, 25 F.3d at 1167–68. "In cases in which the government demonstrates that the other, properly admitted evidence sufficiently proves the elements of the crime for which the defendant was convicted, and there is no reasonable probability that the [Confrontation Clause] violation infected the verdict. [this circuit has] affirmed the conviction despite the confrontation clause violation." *United States v. Kyles*, 40 F.3d 519, 527 (2d Cir.1994), *cert. denied*, 514 U.S. 1044, 115 S.Ct. 1419, 131 L.Ed.2d 302 (1995); *Samuels*, 13 F.3d at 527–28. The most significant factor in determining whether a *Cruz* error is harmless is "the weight of the prosecution's case against the defendant." *Samuels*, 13 F.3d at 526. To evaluate this factor, the court must consider the weight of the evidence "stripped of the Cruz error." *Id.* at 527; *see also Cotto v. Mann*, 991 F.Supp. 124, 131 (E.D.N.Y.1998).

Under the prosecutor's theory of the case, petitioner was identified by an eyewitness as the shooter. The eyewitness who recognized both petitioner and Torres had known both individuals for five years. Another witness, Angel Ruiz, as well as the eyewitness Veliz, provided a motive when they testified that there had been conflict between the people exiting the party and a group with which the defendants associated. Petitioner's statement acknowledged that he was in the vehicle from which the shot was fired. Torres's statement was not significantly more inculpatory of petitioner than petitioner's own statement, and the prosecutor in his summation made no claim that it was. Thus, there was weighty evidence to support petitioner's conviction and no reasonable

probability that the Confrontation Clause error infected the verdict.[1]

The recent case of *Cotto v. Mann,* 991 F.Supp. 124, 131 (E.D.N.Y.1998), illustrates the difference between this case and one where a *Cruz* violation was not harmless. In *Cotto,* the wrongly admitted statement of a codefendant had a significant impact on jury deliberations because it was substantially different from the habeas petitioner's own statement. There, the petitioner had indicated that he was unaware of the substance of a conversation that occurred between his codefendants. The effect of his statement was to convey the impression that he did not have the intent to commit the crime. As Judge Ross noted, the codefendant's statement "provided the sole proof at trial of petitioner's agreement to commit the robbery." *Id.* at 132. Moreover, Judge Ross found, not only was the codefendant's wrongly admitted statement the sole proof against the petitioner, but "the petitioner's statement by itself [does not] establish that he participated in the commission of an at-

tempted robbery." *Id.* at 134. Here, in contrast, Torres's statement, which was very similar to petitioner's, did not provide the sole proof at trial of an essential element of the crime of which petitioner was found guilty.

### Supplemental Reply Brief

 Finally, petitioner's claim regarding the Appellate Division's denial of leave to file a supplemental reply brief raises no federal Constitutional issue.

### Conclusion

The petition for a writ of habeas corpus is denied.

### SO ORDERED.

---

1. As petitioner is pro se, I have considered the effect of the *Cruz* violation under a possible theory raised by one of the jury's notes, which suggested that it considered whether the defendants could be convicted of murder if neither had shot the gun, a scenario offered by both codefendants in their statements. The codefendant's statement reveals only slight differences from petitioner's statement. Both defendants recounted petitioner as the driver of the vehicle, and both stated that a third passenger, Jose, fired the gunshot into the crowd. The only difference appears to be that petitioner's statement recounts that he slowed down after the shot was fired and then sped up to drive away. Torres's statement, on the other hand, explains that, after Jose told petitioner to slow down, petitioner slowed the car down, and then Jose shot the gun. Although Torres's statement could be understood as some evidence that petitioner, by slowing down before the shot, had the intent to commit the crime, the prosecutor made no such argument. And petitioner's own statement admitted that he was aware that Jose had pulled out a gun, an admission which implicates petitioner's knowledge and intent.

While admission of Torres's statement was error, his version of the incident, even if the jury understood it as just described, did not have a substantial or injurious effect on the determination of the jury's verdict. Petitioner and Torres were charged with identical crimes at trial. Both of them were acquitted of intentional murder and both were convicted of depraved indifference murder. Thus, if the jury rejected the prosecutor's theory of the case, and found instead that petitioner did not shoot the gun, the jury nonetheless found enough evidence to convict both petitioner and Torres of acting in concert on a depraved indifference murder charge. That Torres was convicted as well as petitioner, despite the fact that both statements identified petitioner as the driver, signifies that, if the jury in fact acted on this theory, it concluded that, even Torres, who was not implicated by the act of slowing down, was guilty of murder in the second degree and that, even in the absence of Torres's statement, the jury would have found petitioner guilty. Thus, regardless of whether the jury accepted the prosecutor's theory or the defendants' statements that someone else shot the gun, the jury had ample evidence from which to conclude that petitioner was guilty of depraved indifference murder even without the erroneously admitted evidence.