Roberto Antonio ANGELES,
Petitioner,

v.

Charles GREINER, Superintendent, Sing Sing Correctional Facility,
Respondent.

No. 99 CV 6496 NG.

United States District Court,
E.D. New York.

June 10, 2003.

Robert Antonio Angeles, Stormville, NY, Pro–se.

Kenneth v. Byrne, District Attorney's Office, Kew Gardens, NY, for Respondent.

### *ORDER*

GERSHON, District Judge.

This is a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, Roberto Antonio Angeles, is currently incarcerated at Sing Sing Correctional Facility pursuant to a

judgment of conviction rendered May 19, 1995 in New York Supreme Court, Queens County, after a jury trial, under two consolidated indictments. Under the first indictment, petitioner was convicted of two counts of robbery in the first degree, N.Y. Penal Law § 160.15(4), and one count of burglary in the first degree, N.Y. Penal Law § 140.30(4). Under the second indictment, petitioner was convicted of four counts of attempted murder in the second degree, N.Y. Penal Law § § 110, 125.25(1), one count of criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03, and two counts of tampering with a witness in the third degree, N.Y. Penal Law § 215.11(1). Petitioner was tried together with co-defendants Jose Marte and Luis Morales. Petitioner was sentenced to concurrent indeterminate prison terms of from eight and one-third to twenty-five years on each of the robbery convictions and the burglary conviction. On each of the attempted murder convictions he was sentenced to concurrent indeterminate prison terms of from eight and one-third to twenty-five years. Petitioner was also sentenced from five to fifteen years on the criminal possession of a weapon conviction, and from two to four years on each of the tampering with a witness convictions. The sentences under the first indictment were ordered to be served consecutively with those under the second.

Angeles has petitioned this Court on the following grounds: (1) his convictions for attempted murder, weapon possession, and witness tampering were based on insufficient evidence; (2) the court improperly precluded defense counsel from questioning the arresting officer at the suppression hearing and the court made factual findings inadequate to support its determination of probable cause for the arrest; and (3) the trial court deprived him of his right to confrontation by limiting defense counsel's cross-examination of three witnesses regarding the manner in which one of the victims identified his stolen property.

By memorandum decision and order dated May 18, 1998, the Appellate Division, Second Department, unanimously affirmed petitioner's conviction. *People v. Angeles,* 250 A.D.2d 773, 671 N.Y.S.2d 1000 (2d Dept.), *lv. denied,* 92 N.Y.2d 1027, 684 N.Y.S.2d 492, 707 N.E.2d 447 (1998). The Appellate Division held: (1) the trial court acted properly in limiting the cross-examination of an arresting officer at the suppression hearing in order to protect the identity of the confidential informant; (2) the summary report issued by the court satisfied the requirements of *People v. Darden,* 34 N.Y.2d 177, 356 N.Y.S.2d 582, 313 N.E.2d 49 (1974); and (3) defendant's insufficiency of the evidence claim was unpreserved for appellate review and, alternatively, was without merit. The court found that the petitioner's remaining contentions, which included the confrontation clause claim raised here, were either unpreserved for appellate review or without merit.

**Facts**

On April 26, 1993, at approximately 10:00 a.m., petitioner, along with co-defendants Marte and Morales, knocked on the back door of the home of Hilde and Olga Vargas in Queens, New York. Ms. Vargas testified at trial that the men wore dark suits with identification tags affixed to their jackets. They were holding notepads that were labeled "City of New York" and were carrying briefcases. The men identified themselves as New York City inspectors conducting a census to check boilers. When Ms. Vargas refused them entry, Marte pointed a gun at her head, and forced his way into the home. Ms. Vargas then told the men that Betsy Rodriguez, a friend of the Vargases who was staying with the family, was in the basement.

Marte and Morales descended to the basement where they found Ms. Rodriguez sleeping. Angeles remained upstairs with Ms. Vargas.

Once in the basement, Marte, holding a square shaped gun in one hand, pulled the sheets off of Rodriguez's bed. In Spanish he asked her where the safe with the money was, and she told him she knew nothing of a safe. Meanwhile, Morales, also in the basement, put on latex gloves and cut the telephone wires. Marte continued to question Ms. Rodriguez about the safe, and told her that he would kill her. Marte and Morales then searched the basement closets. While Marte and Morales were in the basement with Ms. Rodriguez, Angeles brought Ms. Vargas to her bedroom. He communicated with the other two defendants via handheld radio. Ms. Vargas testified that while she was in the bedroom with Angeles, he told her that if she didn't give him everything Marte would kill her. Marte then came upstairs, put on Mr. Vargas's hat and sunglasses, and told Ms. Vargas to get the drugs. Ms. Vargas was then told that the men had kidnapped her husband and that if she didn't give them everything, they would kill him. Ms. Vargas then proceeded to empty the bedroom safe of its contents, including $10,000 cash and jewelry. Marte then pointed a square gun at her head and led her to one of her son's bedrooms and told her again to find the drugs. The men also told her that they knew where her children went to school and that for one month they had been following the family.

Marte and Angeles then brought the two women into the dining room, where Angeles told the women that the men would return and kill the women if they called the police. Angeles told Ms. Vargas to write down her home phone number on a piece of paper, which he put in his pocket. The men then left the house by the same door through which they entered. Both women testified to seeing the men drive off in a big, old, light gray car. Using the one phone that Marte did not disable, Ms. Rodriguez called Mr. Vargas at work. After he arrived home, Mr. Vargas called the police.

On May 5, 1993, Ms. Vargas and Ms. Rodriguez identified Marte in a police line-up as one of the men who robbed her. On May 7, 1993, Mr. Vargas received a phone call at work. The caller, speaking Spanish with a Dominican accent, told Mr. Vargas that if Ms. Vargas testified at the Grand Jury he would kill Mr. Vargas, Ms. Vargas and their children. On May 10, 1993, at approximately 2:00 p.m., Louis Sosa, an employee of Mr. Vargas, received a phone call at work from a Spanish-speaking male with a Dominican accent. When Mr. Sosa told the caller that Mr. Vargas was not there, the man told Mr. Sosa to tell Vargas that he would not like the consequences if he showed up tomorrow. On May 11, 1993, the day before Ms. Vargas and Ms. Rodriguez were scheduled to appear before the Grand Jury, the Vargas's home in Queens was riddled with bullets at approximately 1:15 a.m. The bullets shattered the windows in the front of the house, the porch, and the Vargas's bedroom. One of the bullets went through one of the children's bedrooms. Mr. Vargas then called the police.

Soon after the shooting on May, 11, 1993, several officers arrived at the Vargas's home. Officer Busby recovered nine, nine-millimeter shells from the street outside the house, two shell fragments from the Vargas's bedroom wall, and one round next to their bed. Officer Langstrand recovered two spent shells from outside of the house. On May 12, 1993, officers arrested Morales inside of his apartment where they recovered a portable radio, a shopping bag containing six spent shells,

and two spent shells from the dresser. On May 12, 1993, Ms. Vargas and Ms. Rodriguez identified Morales from a police line-up as one of the men from the incident of April 26, 1993.

At trial, Detective Joseph Amato testified that ten of the shell casings recovered from the Vargas's home were fired by one gun and one of the shell casings was fired by a different gun. Detective Amato also testified that the shells recovered from Morales's apartment matched the one shell recovered from the Vargas's that was different from the other ten. Those shells were fired from an SWD model M–11 gun. According to Amato's testimony, while ninety-nine percent of all the firearms in the world have a circular firing pin which leaves a round crater in the back of the shell casings, the M–11 leaves a rectangular pin hit.

On December 1, 1993, petitioner was arrested by FBI agent Robert Bukowski on an unrelated matter. Bukowski recovered from petitioner a wallet containing a Dominican driver's license and a pawn ticket from Gem Pawn Brokers in the Bronx. Agent Bukowski visited the pawn shop and was told that the account number on the pawn ticket was for petitioner's account. On January 6, 1994 and January 14, 1994, Agent Bukowski put a "police stop" on the items under petitioner's account. On August 4, 1994, Ms. Vargas identified petitioner at a police line-up as the man who had remained with her upstairs during the incident of April 26, 1993. Ms. Rodriguez was pregnant and did not attend the line-up. On September 1, 1994, Agent Bukowski and Mr. Vargas visited the pawn shop, where Mr. Vargas was shown the property in petitioner's account. Mr. Vargas identified certain pieces of jewelry as his own, missing since April 26, 1993. Mr. Vargas again identified those pieces of jewelry at trial. Both Ms. Vargas and Ms. Rodriguez identified petitioner in court.

## Suppression Hearing

On February 2, 1995, the court held a suppression hearing regarding the evidence recovered from petitioner upon his arrest and the subsequent police line-up. In conjunction with the suppression hearing, the court conducted an *in camera* inquiry [1] of the confidential informant who provided information to Agent Bukowski which led to petitioner's arrest. On March 28, 1995, the court issued a summary report of that *in camera* inquiry. It stated that (1) the confidential informant did exist; (2) the informant communicated to Agent Bukowski that on December 1, 1993, three men, including petitioner, were at a particular location in New York City, seated with weapons in an automobile; and (3) the informant's information was reliable as it was confirmed through Agent Bukowski's observations. The suppression motion was denied.

## DISCUSSION

### Exhaustion

A state prisoner seeking federal habeas corpus review of his state court conviction

---

1. Pursuant to *People v. Darden,* 34 N.Y.2d 177, 181–82, 356 N.Y.S.2d 582, 313 N.E.2d 49 (1974), an *in camera* hearing ("Darden Hearing") is conducted when there is insufficient evidence to establish probable cause for an arrest apart from the arresting officer's testimony as to communications with a confidential informant. The prosecution is required to make the informant available for the hearing. The prosecutor may be present but the defendant and defense counsel may not. After the hearing is conducted, the hearing judge is required to issue a report regarding (1) the existence of the informant; (2) the nature of the communications between the informant and the officer; and (3) the reliability of the informant's information.

must first exhaust his available state court remedies. *See* 28 U.S.C. § 2254(b)(1) and (c). This requirement is rooted in notions of comity. *See Daye v. Attorney General of the State of New York,* 696 F.2d 186, 191 (2d Cir.1982). The exhaustion requirement is satisfied only after the federal claim has been "fairly presented" to the state courts. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Bossett v. Walker* 41 F.3d 825, 828 (2d Cir.1994). For a claim to be "fairly presented," the claim before the federal habeas court must be the "substantial equivalent" of the claim presented to the state courts. *Picard,* 404 U.S. at 275, 92 S.Ct. 509.

### Standard of Habeas Corpus Review

The federal habeas corpus statute provides that an application for a writ of federal habeas corpus on behalf of a person in state custody, shall not be granted with respect to any claim that was adjudicated on the merits in a state court proceeding unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1). A state court decision is an "adjudication on the merits" even when it does not explicitly refer to the federal claim or discuss the reasoning for its decision, so long as it finally resolves a party's claims and is based on the substance of the claim advanced, rather than on a procedural ground. *Sellan v. Kuhlman,* 261 F.3d 303, 309–315 (2d Cir. 2001). Clearly established law is that "dictated by precedent existing at the time the

defendant's conviction became final." *Williams v. Taylor,* 529 U.S. 362, 381, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citing *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). A decision is "contrary to" clearly established law if it represents a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides the case differently from how the Supreme Court has on a materially indistinguishable set of facts. *Williams,* 529 U.S. at 405, 120 S.Ct. 1495. A decision results in an "unreasonable application" of clearly established federal law if it identifies the correct principle of law but misapplies it to the facts. *Id.* at 426–27, 120 S.Ct. 1495. In addition, the state court's factual findings are entitled to deference, and the petitioner bears the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### Insufficiency of the Evidence

█ Petitioner claims that the evidence produced at trial was insufficient to convict him on charges of attempted murder, criminal possession of a weapon, and witness tampering. He contends that, while there may have been evidence of motive for his committing these crimes, the prosecution produced no evidence linking him to the telephone threats or the shooting.

Petitioner's claim is procedurally barred. "[A] procedural default does not bar consideration of a federal claim on ... habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotations mark omitted). Here, the Appellate Division held that:

[t]he defendant's challenge to the legal sufficiency of the evidence supporting his convictions under [the second] indictment is unpreserved for appellate review. *In any event,* viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

*People v. Angeles,* 250 A.D.2d 773, 671 N.Y.S.2d 1000 (emphasis added) (internal citations omitted).[2] Although the Court of Appeals for the Second Circuit explained that "to require a state court to use specific talismanic phrases when ruling in the alternative would be undue formalism," *Glenn v., Bartlett,* 98 F.3d 721, 725 (2d Cir.1996), it has explicitly held "that where a state court says a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 811 n. 4 (2d Cir.2000).

A habeas corpus petitioner can overcome this procedural default only upon a showing of cause for the default and actual prejudice resulting therefrom, *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), or by demonstrating a "fundamental miscarriage of justice" by making a "colorable" claim of actual innocence. *McCleskey v. Zant,* 499 U.S. 467, 494–95, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Here, petitioner has made no effort to show cause for the default, nor has he made a showing of actual innocence. Thus, petitioner's claim of insufficiency of the evidence is procedurally barred from habeas corpus review. In any event, the Appellate Division's affirmative finding on the merits, clearly meets AEDPA's deferential standards.

**Fourth Amendment Claim**

■ Petitioner asserts that the trial court improperly precluded defense counsel from questioning the arresting officer at the suppression hearing and that the court made factual findings inadequate to support its determination of probable cause for the arrest. Therefore, petitioner claims, the property and line-up identification arising out of the arrest should have been suppressed.

In *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." Following *Powell,* the Court of Appeals for the Second Circuit "developed a litmus test to discern when a state prisoner has been denied an opportunity for full and fair litigation of his fourth amendment claims." *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992). Specifically, in *Gates v. Henderson,* 568 F.2d 830 (2d Cir.1977), the Second Circuit held that a federal habeas court may review a Fourth Amendment claim only in either of two instances. First, "[i]f the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available." *Id.* at 840. Second, a federal habeas court may review a state prisoner's Fourth Amendment claim when, despite the existence of a satisfactory corrective procedure, "the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process...." *Id.* Neither situation exists here.

Federal courts have approved New York's procedure for litigating Fourth

---

**2.** Here, the Appellate Division was the last state court to issue a reasoned opinion. The Court of Appeals denied leave to appeal without comment.

Amendment claims, embodied in N.Y.Crim.Proc.Law § 710.10 *et seq.* (McKinney 1995), as being facially adequate. *See Capellan,* 975 F.2d at 70, n. 1. Therefore, this Court is precluded form hearing petitioner's Fourth Amendment claim unless there occurred "an unconscionable breakdown" in the corrective process. An unconscionable breakdown occurs when the hearing judge fails to make a reasoned inquiry into a defendant's claims. *See Ortiz v. Artuz,* 113 F.Supp.2d 327, 335 (E.D.N.Y.2000). In this case, the issue is whether the procedures used by the trial court amounted to an unconscionable breakdown in the process. Petitioner complains of the fact that he was precluded from asking the agent about the information provided to him by the informant, other than to be allowed to elicit that the agent arrested petitioner based on information he got from someone else. As thoroughly analyzed by then District (now Circuit) Judge Reena Raggi, in *Hunte v. Keane,* 1999 WL 754273 (E.D.N.Y.1999), the use of *Darden* procedures to protect the identity of an informant cannot be said to violate clearly established federal due process requirements as determined by the Supreme Court.

The issue presented in this case, however, is whether defendant's constitutional rights were violated by the limitations on cross examination of the witness FBI Agent Bukowski imposed by the judge at the suppression hearing. In *People v. Castillo,* 80 N.Y.2d 578, 592 N.Y.S.2d 945, 607 N.E.2d 1050, (2d Dep't 1992), *cert. denied* 507 U.S. 1033, 113 S.Ct. 1854, 123 L.Ed.2d 477 (1993), which is cited by Judge Raggi with approval in *Hunte,* such limitations were found to be proper. Whether or not the trial court was overly restrictive of cross-examination during the suppression hearing, it cannot be said that the Appellate Division's approval of the procedures used, and the limitations on

cross-examination imposed, to protect the identity of the informant violated clearly established federal law as determined by the Supreme Court.

As a practical matter, the heart of the probable cause was in the evidence provided by the informant which the trial judge found sufficient. It is clear from the suppression hearing that what defense counsel was most interested in was the informant's identity, the very information which a *Darden* hearing is designed to protect. Even had such questions been allowed, they were not likely to have revealed a basis for challenging the trial court's finding of probable cause. The Appellate Division held that the trial court "acted properly in limiting the cross examination of an arresting officer at the suppression hearing in order to protect the identity of the confidential informant," *People v. Angeles,* 250 A.D.2d 773, 671 N.Y.S.2d 1000 (2d Dep't 1998), and since petitioner had a fair opportunity to challenge the finding of probable cause in the state court, *Powell* bars petitioner's Fourth Amendment claim.

**Sixth Amendment Claim**

 Petitioner asserts that his constitutional right to confrontation was violated when the trial judge limited defense counsel's cross-examination of certain witnesses relating to the procedure by which Mr. Vargas identified his jewelry. In affirming the conviction, the Appellate Division did not address this claim directly. Instead, it held, after addressing the other two claims, that the "defendant's remaining contentions are either unpreserved for appellate review or without merit." *People v. Angeles,* 250 A.D.2d 773, 671 N.Y.S.2d 1000 (2d Dept.1998). As stated above, however, "a procedural default does not bar consideration of a federal claim on ... habeas review unless the last state court rendering a judgment in the case

clearly and expressly states that its judgment rests on a state procedural bar." *Harris,* 489 U.S. at 263, 109 S.Ct. 1038 (internal quotations mark omitted). And, the Court of Appeals for the Second Circuit has explicitly held that the phrase 'either unpreserved or without merit' is not a clear and express statement. *See Fama,* 235 F.3d 804. This Court, therefore, may review petitioner's Sixth Amendment claim on the merits. Since the Appellate Division's decision is not clearly on the merits, AEDPA deference is inapplicable to this claim. *See Sellan,* 261 F.3d 303.

■■■ The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal prosecution the right to confront the witnesses against him. *See Henry v. Speckard,* 22 F.3d 1209, 1214 (2d Cir.1994). This right applies to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In cross-examining a witness, the "opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed.1940)). However, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (emphasis in original). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Here, the trial court did not unconstitutionally limit defense counsel's cross-examination of Detective Beuchamp, Mr. Vargas, and Detective Bardin regarding the manner in which Mr. Vargas identified the jewelry from the pawn shop. The defense was permitted to elicit that the jewelry bore no initials or other distinguishing marks. That the defense was limited in its questions as to the procedure used in the identification did not violate the Confrontation Clause.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.

**SO ORDERED.**